Thomas S. MICHALIC, Plaintiff-Appellant,

v.

CLEVELAND TANKERS, INC., Defendant-Appellee.

No. 13580.

United States Court of Appeals Sixth Circuit.

Oct. 29, 1959.

Harvey Goldstein, New York City (S. Eldridge Sampliner, Cleveland, Ohio, on the brief), for appellant.

Lucian Y. Ray, Cleveland, Ohio (of McCreary, Hinslea & Ray, Cleveland, Ohio, on the brief), for appellee.

Before SIMONS and ALLEN, Circuit Judges, and O'SULLIVAN, District Judge.

PER CURIAM.

This action by a seaman, under the Jones Act (Title 46 U.S.C.A. § 688), concluded by the District Judge's direction to a jury to return a verdict of no cause of action. The propriety of such direction is the matter here for review.

For some years prior to December 28, 1955, plaintiff had been suffering from Buerger's disease. In 1951 he was hospitalized from an injury consequent upon dropping a sack of cement on his foot, although which foot was not disclosed. In 1952 he was again hospitalized and he then learned that he was suffering from Buerger's disease in his left foot. Some surgery, including the cutting of a nerve in his back, was performed for the purpose of relieving pain which he was then suffering in his left leg.

He claims that on or about December 28, 1955, while using a wrench to remove nuts on a pump housing on defendant's vessel, the wrench, when he struck it with a mallet, slipped and fell, striking the big toe in his left foot. Without interruption, he continued working on the vessel until the conclusion of the lay-up in January, 1956. He rejoined the vessel on March 15, 1956. Plaintiff testified that after a few trips on the boat his leg became so bad he could no longer stand it. He then told his superior officers he wished to get off the boat and asked for a hospital ticket. This was on April 1, 1956. He then, for the first time, told of the claimed incident of the dropping of the wrench. Until then he had told no one of the incident, although he testified that his toe had begun to bother him immediately following the occurrence, requiring him to bathe it rather continuously while on the boat and after the season of navigation while ashore. He did not tell of the accident to the pumpman who had been working with him in the pumproom on the day it occurred. He said he did mention it to a couple of deckhands. Upon receipt of the hospital ticket he went to a Marine Hospital where several amputations were performed, the final one resulting in the amputation of his leg above the knee.

Plaintiff's complaint charged that the vessel and its equipment were unseaworthy and that the defendant was negligent. Aside from some general conclusionary allegations of negligence and unseaworthiness, his specific charges up-

on which he relied for a cause of action consisted of assertions—

That the defendant did not provide a safe place or way to work; that defendant provided him with a defective wrench, knowing that, "the teeth of the wrench would not hold or be secure"; that defendant ordered and permitted him to work in close quarters; that defendant should have known of a defective condition of the teeth of the wrench; that defendant failed to provide him with a proper and secure wrench which would not loosen when average pressure would be applied; that defendant failed to provide adequate, proper and seaworthy and safe appliances, to wit: a proper wrench without worn teeth; that defendant failed to maintain a proper lookout for the plaintiff, and failed to supervise the removal of the nuts off the pump, and to replace a defective, old and unseaworthy wrench; that defendant failed to provide plaintiff with skillful, careful and competent co-employees.

On the trial it was disclosed, without dispute, that the wrench being used by plaintiff did not have any teeth in it, but was an open-end wrench, with a jaw opening of about 1⅝ inches, approximately 12 inches long and weighing 2½ pounds. It was made of spark-proof alloy metal. Plaintiff was also provided with a metal mallet for the purpose of striking the wrench in the process of loosening the nuts.

On this review, we accept plaintiff's proofs as true and in their most favorable light. Plaintiff and a fellow workman described the condition of the tools with which he was working variously as follows:

"It was a big wrench, old, beat up wrench."

"An old lead mallet they used in the pumproom."

"It was an old wrench, all chewed up on the end."

He testified he told the pumpman:

"This tool is not very good, kind of beat up. This wrench keeps slipping off."

The pumpman said:

"Never mind about that, do the job the best you can."

A former Mate and Captain of the vessel who had been discharged by defendant, described the tools being used in the pumproom in December, 1955, as being, "in beaten and battered condition * * they had been very beaten and battered."

Although plaintiff's pleadings made no charge of inadequate light or cramped quarters in the pumproom, the following testimony was received on these subjects:

As to illumination, plaintiff said, "to my estimation, it was poor, very poor."

"Q. Did they have any other electricity? A. No sir, they only had shore lights that's all.

."Q. As far as the illumination in that room, what other illumination was there besides the portable light? A. Nothing, that's all we had, just the portable light.

"Q. And where was it hanging? A. The portable light was hanging over the pumpman's pump on the port side. He had a string tied to it and it was hanging right down beside his pump."

Referring to the portable light in the pumproom, he stated:

"I attempted to move it over to where I was, but it was too short, it wouldn't reach my pump at all."

"Q. Was there any light provided at the catwalk in that area at all, other than what you have described? A. No, sir."

Referring to the portholes between the engine room and pumproom, plaintiff said:

"Those portholes were all dirty and greasy from grease flying around the pumproom."

A fellow workman testified in relation to the light:

"Well, the pumproom wasn't too large. It wasn't a large pumproom and the lighting wasn't too good. In

fact, we had to use an extension cord."

The former Mate of the vessel, referring to the lighting in the pumproom, said:

"Very poor. In this lower level at all times it was necessary to use a flashlight in order to see anything in working on this grating level or below."

As to the cramped space in the pumproom, plaintiff testified:

"I was ordered to go into the pumproom. This is the catwalk going from one end of the ship, from the starboard to the port side * * *"

"Q. Now, did you have to get off the catwalk? A. Yes, sir. I had to get off that catwalk, and I had to crawl between four beams that hold the pump from vibrating, work underneath the catwalk.

"Q. As you were working there you stated you had to get between four beams. Can you describe them a little bit? A. Yes, I can. The four beams they help the pump. When the pump is pumping out cargo in a port, the four steel beams that come around the pump keep the pump from vibrating when they are pumping out.

"Q. What is the distance from the top of the pump to the catwalk where you had to go in there and work? A. About six inches.

"Q. Is that the area you had to work? A. Yes."

The above constitutes substantially all of the evidence relevant to the conditions in the pumproom and the condition of the tools with which plaintiff was working. There was no testimony in any way supporting a claim that the slipping or dropping of the wrench was brought about by, or related in any way to, the lighting conditions of the pumproom or to the smallness of the area. Plaintiff had actually removed all but five of an estimated total of twenty nuts before the wrench fell. He makes no claim that the progress of his work was in any way impaired or made more difficult by inadequate lighting or cramped quarters.

"Q. You had no difficulty seeing the bolts, did you? A. No, sir."

Plaintiff's description of the accident is as follows:

"Q. What happened after you took off the bolts and nuts? A. After I started taking the bolts off with the old wrench, only about three or four more to get loose, a couple of them, I had hold of a nut * * * and I hit the wrench and it slipped off and it hit me on the foot at the big toe."

\* \* \* \* \* \*

"Q. Now, when you were taking the bolts and nuts off, how many of those nuts had you taken off at the time the wrench slipped? A. I had them all off but about five or six.

"Q. You took those off without difficulty? A. I had a hard time loosening them off.

"Q. But you got them off? A. Yes.

"Q. In other words, you put the wrench on there and tapped it with the mallet and loosened them and then you turned the nuts off? A. I had a hard time taking them off.

"Q. But you took them off? A. Yes. The pumpman told me, 'Do the best you can'.

"Q. You got them off, and you got all but how many off at the time the accident occurred? A. About five.

"Q. And you were using the same wrench? A. The same wrench.

"Q. And the same mallet? A. Same mallet all the way through."

\* \* \* \* \* \*

"Q. Did you become aware that this wrench as you have described, was getting worn as you were taking these nuts off? A. I told him about it, yes sir.

"Q. Did you go out and try to get another wrench out of the box? A. No, sir, he told me 'You do the best you can with that wrench right there.'

"Q. He told you not to use another wrench? A. He said, 'You do the best you can with that wrench right there'.

"Q. That's the only wrench you could use? A. The only wrench that I had to use."

\* \* \* \* \* \*

"Q. Now, will you describe with as much particularity as you can just how the wrench slipped off the nut? A. Like I say, I had the wrench in my hand.

"Q. You were standing next to the pump? A. I was standing. I got hold over here, and I hit it with the mallet and it slipped off the nut and came down the side of the pump and hit my big toe.

"Q. You hit the handle of the wrench with the mallet? A. Yes, she slipped off the nut on the pump and came down the side of the pump and smashed my big toe.

"Q. That's exactly the way you did it on all the others? A. I had to use the mallet on all the nuts, that's right. They were pretty tight.

"Q. In other words, you had gone through the same maneuver on the others as you had with this? A. Yes, sir.

"Q. Did you have any difficulty putting the wrench on the nuts before hitting it with the mallet? A. Yes, sir, they slipped.

"Q. What slipped? A. The wrench did."

\* \* \* \* \*

"Q. I am talking about putting the wrench on the nuts. Did you have any difficulty putting the wrench on the nuts you took off? A. I told you the wrench was slipping off the nuts. It slipped off every one of them."

A fair reading of the District Judge's oral opinion given when granting the motion for a directed verdict, indicates his conclusion that there was no evidence from which the jury could make a finding of negligence or unseaworthiness. We concur in this conclusion and further express our opinion that there was a failure of proof as to any causal connection between the conditions which plaintiff complained of, namely, improper lighting, close quarters and improper tools, and the injury which he suffered.

Neither by accepting plaintiff's proofs in their most favorable light nor by drawing all legitimate inferences therefrom, can it be said that insufficient light or cramped working space had anything to do with the slipping of the wrench which was the immediate cause of the plaintiff's injury.

We come, then, to consideration of whether there was any evidence from which a jury could find that negligence of the defendant or unseaworthiness of the vessel and equipment in any degree contributed to the slipping of the wrench and its falling upon the plaintiff's foot. The allegation of the complaint with reference to teeth of the wrench being worn was abandoned upon showing that it had no teeth, but was an open-end wrench. To say that a wrench is old, beaten, battered or chewed up gives no information as to whether or not the wrench was adequate or inadequate to perform its function of loosening a nut. Neither do the above adjectives tell whether the grip of the wrench was in any way impaired or it was otherwise an unsafe tool. The plaintiff's evidence did not disclose what part of the wrench was beaten, battered or defective, except that it was "chewed up" on the end. There was no evidence of any improper design of the wrench or the mallet. The evidence discloses no claim or inference by plaintiff or his witnesses that the wrench slipped or fell because of any inadequate grip, nor that the wrench slipped or fell because the jaw of the wrench did not properly fit the nuts which were to be loos-

ened by it. There was no evidence that the open or jaw end of the wrench was in any way deficient. We do not think merely stating that the wrench was beaten, battered, old, or chewed up is sufficient to allow an inference that it could not be used safely in the function for which it was designed. Evidence that the wrench was beaten, battered or chewed up, without other definition, was insufficient, in our opinion, to permit a jury to find that these thus described conditions, or any of them, were the cause of its slipping. The fact that the wrench slipped is not evidence that its slipping was the consequence of some condition in the jaw or handle of the wrench. There is no evidence from which it could be inferred that some condition described in the evidence contributed proximately as a cause of the slipping.

 The recent cases of Rogers v. Missouri Pacific Railway Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, and Ferguson v. Moore-McCormack Lines, 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511, relied upon by appellant, emphasize the jealousy with which today's courts guard the rights of injured workmen to have their causes submitted to a jury where there is any evidence, however slight, to justify a jury's factual finding of liability. The rule that the plaintiff in such a case as this has the obligation to produce some evidence to prove, or permit a justifiable inference of, negligence and proximate cause is, however, still a part of our law. It is the function and duty of trial courts to determine whether or not in a particular case there is any evidence to justify the submission of a case to a jury.

In the case of Ferguson v. Moore-McCormack, supra, the Supreme Court affirmed the rule that the standard of liability under the Jones Act is the same as applied in actions under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. In a case arising under the latter Act, the United States Supreme Court in the case of Moore v. Chesa-peake & O. Railway Co., 340 U.S. 573, 575, 71 S.Ct. 428, 429, 95 L.Ed. 547, said:

"To recover under the Act, it was incumbent upon petitioner to prove negligence of respondent which caused the fatal accident."

We approve the ruling of the District Judge that the plaintiff in this case failed to provide any evidence from which a jury could find liability. It should be noted here that on his second cause of action for maintenance and cure, plaintiff recovered $2,610.00. No appeal was taken from that judgment.

The judgment of the District Court is affirmed.