[Cite as *State v. Shoopman*, 2011-Ohio-2340.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,                                            CASE NO. 14-10-17

    PLAINTIFF-APPELLEE,

v.

JACKIE SHOOPMAN, JR.,                          **O P I N I O N**

    DEFENDANT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 10-CR-0005

**Judgment Affirmed**

**Date of Decision:  May 16, 2011**

APPEARANCES:

    *Alison Boggs* **for Appellant**

    *Terry L. Hord* **for Appellee**

**ROGERS, P.J.**

{¶1} Defendant-Appellant, Jackie W. Shoopman, Jr., appeals from the judgment of the Court of Common Pleas of Union County convicting him of felonious assault and tampering with evidence. On appeal, Shoopman argues that his conviction was against the manifest weight of the evidence. Based on the following, we affirm the judgment of the trial court.

{¶2} In January 2010, the Union County Grand Jury indicted Shoopman on Count One, felonious assault, in violation of R.C. 2903.11(A)(2), a felony of the second degree, and Count Two, tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. The indictment arose from an incident whereby Shoopman was involved in an altercation with the victim and then discarded the knife that he used to stab the victim. Subsequently, Shoopman entered a not guilty plea to the charges.

{¶3} In May 2010, the case proceeded to a jury trial. Lucas McClincy was the State's first witness. McClincy testified that he was at Little Tony's Pizza ("Little Tony's") in Union County on the night of February 21, 2009 and the early morning of February 22, 2009. According to McClincy, Jay Neely ("Neely") was at Little Tony's that night and had prevented a fight between two men. One man involved in that confrontation then approached Neely; Neely and this individual went to the back patio and fought. Neely then returned to the inside of Little Tony's when a man wearing a rebel hat and a tank top came into Little Tony's and

asked the bartender who Jay Neely was, where he was, and if he was the man who got into a fight with his brother. McClincy identified the man wearing the rebel hat and tank top as Defendant. McClincy continued to testify that Shoopman went outside and sat in a car at the corner of the parking lot. About thirty minutes later McClincy, noticing that Neely was gone, walked outside the door and saw that Shoopman and Neely were facing each other and arguing, and then went toward each other. McClincy testified that Shoopman struck Neely in his left shoulder; that Neely went down to his knee, that Neely never threw a punch; that Neely came back into Little Tony's; and, that Shoopman was holding something in his hand that looked like a knife. When Neely returned to Little Tony's, McClincy noticed Neely was bleeding and helped him address the wound, applying pressure to keep it from bleeding. The police arrived shortly thereafter.

{¶4} On cross examination McClincy testified that he knew Neely because he saw him once or twice a week for six weeks at Little Tony's. He testified that Neely had been drinking the night of February 21, 2009, but did not appear intoxicated.

{¶5} Doctor Douglas Skura, an orthopedic surgeon, testified that he was working the night of February 21, 2009 at Memorial Hospital of Union County; and, that he assessed Neely's injuries with Dr. Matthew Sanders. Dr. Skura examined Neely, reviewed x-rays, and treated Neely with exploration and irrigation of the stab wound, antibiotics, and pain medication. Dr. Skura testified

that Neely said he had come out of a tavern where two brothers were waiting for him; one brother punched him in the left temple and the other stabbed him in the left shoulder with a long-bladed knife. Dr. Skura testified that Neely's statements were consistent with his injuries; that the wound was to the deltoid on the outer cap of the left shoulder, measuring about an inch long and about two and a half inches deep. Dr. Skura testified that this wound was quite deep, but since it did not enter the lung or other vital structure, it did not require surgery. Dr. Skura testified that the wound must have been caused by something sharp and at least five centimeters long. When shown State's Exhibit 4, the knife that was found at the scene with Neely's blood on it, Dr. Skura testified that it was consistent with the type of instrument that could have caused Neely's injury and was capable of causing death.

{¶6} On redirect examination, Dr. Skura testified that it would have been very difficult, if not impossible, that Neely's wound could have been self-inflicted; Neely was 5'6" and 240 pounds. These dimensions make it almost impossible to reach across and inflict a two-and-a-half inch deep stab wound. On recross examination Dr. Skura testified that he did not test whether Neely's right arm was able to reach across to his left side.

{¶7} Doctor Matthew Sanders, an emergency physician, testified that he was working at the Union County Memorial Hospital on February 22, 2009. Dr. Sanders examined Neely, who presented with a stab wound to his left shoulder.

When Dr. Sanders saw State's Exhibit 4, the knife with Neely's blood on it, he testified that it was consistent with what would cause the type of injury on Neely, and that the knife could have caused death.

{¶8} Jay Neely testified that he arrived by himself at Little Tony's on February 21, 2009, around eight o'clock in the evening. A fight broke out between a smaller guy and another man when Neely stepped in between them and prevented the larger man from hurting the smaller man. The larger man then started to yell and threaten Neely; Neely and the larger man went out to the back patio and fought. Neely testified that after the fight, he went back inside; the bartenders kicked out the other man. Neely testified that as he was leaving out of the front door and walking to his vehicle, one of two men started yelling threats to Neely. The man with whom Neely originally fought was slightly behind and to the right of Neely, and the other man approached in front. Neely identified the approaching man as Shoopman, who was wearing a tank top and a rebel hat. The man on Neely's right punched Neely in the head. When Neely looked up he saw Shoopman hit him in the shoulder. Neely testified that people were shouting, "Knife!" Neely looked at Shoopman's right hand and saw a knife reflecting light from the light pole. Neely felt something running down his left arm and saw blood so he walked back into Little Tony's. People inside Little Tony's tended to his wound. Neely testified that he had never seen Shoopman before; that he had

seen Robert Gray ("Gray") once or twice before; and, that no one else was wearing a tank top and a rebel hat that night.

**{¶9}** On cross examination Neely testified that he arrived at Little Tony's at approximately 8:00 P.M. and left Little Tony's at approximately 1:30 A.M., after having consumed about six to seven beers. He testified that Gray struck him in the head first. Neely also testified that he called the police department on the morning of February 23, 2009, to inquire as to the progress of the investigation. Neely was informed that the knife had not yet been found. He met the police at Little Tony's but by this time the police found the knife. Neely testified that he never saw the entire knife until going back to Little Tony's on February 23, 2009.

**{¶10}** Danielle Clevenger, a bartender at Little Tony's, testified that she was working at Little Tony's on the night of February 21, 2009 and into the early morning of February 22, 2009; that a fight broke out between Gray and another man; that Neely tried to break up the fight; that Gray and Neely started fighting on the back patio; that after the fight, Gray and Neely went back inside; and, that Gray was disturbing everybody and being belligerent, so she asked Gray to leave. Clevenger testified that Gray eventually left; that another man came into Little Tony's asking who Neely was; that this man was dressed in a tank top and rebel hat; and, that she was apprehensive of him because he looked like someone who fought. At the same time, someone saw Gray's car in the parking lot again.

{¶11} Clevenger testified that she went out of Little Tony's, and that Neely also went out of Little Tony's. Clevenger approached the side of the building when she saw Gray and the other man coming out of Gray's car, heading toward the front door. Clevenger testified that she tried to go back inside Little Tony's to call the police; that Gray tried to stop her from getting back into the building; that Gray and she had an altercation; that she heard someone say that somebody in the parking lot had a knife; that Gray then headed back to the parking lot; that she saw the man who was dressed in the tank top and rebel hat with something in his hand; and, that she saw Neely stagger backwards, come up, and run for Little Tony's. She then identified Shoopman as the man wearing the rebel hat and tank top, who had something in his hand. Clevenger testified that Neely was bleeding everywhere; and, that she spent about two hours cleaning up Neely's blood. Clevenger testified that she never saw Neely with a weapon; that after the altercation both Gray and Shoopman ran to Gray's car and were there when police arrived; and, that the police arrived and placed Gray in handcuffs and later placed Shoopman in handcuffs.

{¶12} On cross examination Clevenger testified that she saw two men exit the car; that she and Gray had pushed and shoved each other when she tried to reenter Little Tony's; and, that there were several people in the parking lot. On redirect examination, Clevenger testified that, as a result of her altercation with Gray, her foot was shoved under the door so she was shoving him to get her foot

free. She testified that there was a lot of shouting in the parking lot; that the man in the parking lot with Neely had a knife; that Gray then took off toward the parking lot; that she went inside and tended to Neely; and, that shortly thereafter the police arrived. On recross examination Clevenger testified that she did not include in her police report the fact that her foot was caught under the door or that she had seen a knife.

{¶13} Michael Amsbaugh testified that he was at Little Tony's on the night of February 21, 2009 and the early morning of February 22, 2009. He testified that he had stepped outside Little Tony's and saw a man wearing a tank top walking across the parking lot to the furthest corner of the parking lot to get in his car. Before he got into the car he did an overhand motion like he was throwing something. Amsbaugh testified that he told the police that it looked like the man threw something across the road; that the man proceeded to get in the car; and, that he told the police that the man they were looking for was sitting in the car in the corner of the parking lot. Amsbaugh testified that he did not include in his written report to the police that the man wearing the tank top appeared to have thrown something across the road; and, that he did not know any of the individuals involved in the altercation.

{¶14} On cross examination Amsbaugh testified that he was at Little Tony's the night of February 21, 2009 for his younger brother's twenty-first birthday party; that he did not remember what time he walked out of the Little

Tony's; that he told police officers it looked like the man threw a knife because it was shining in the lights, like the blade of a knife; that he saw two other men in the parking lot to his right – one who was stabbed and someone else; that the person with the knife was walking alone toward his car; that it looked like the man threw something across the road; that he then went back into Little Tony's to address the wound of the man who was stabbed; and, that he did not see the confrontation in the parking lot.

{¶15} Sergeant Ron Nicol of the Marysville Division of Police testified that he was working on the night of February 21 and 22, 2009; that he responded to a call reporting a fight in Little Tony's parking lot; that when he arrived Officer John Murray was already on scene and had detained someone in the back of his cruiser. Sergeant Nicol testified that he walked toward the building where a group of people were "agitated and hollering" (Trial Transcript, p. 173); that they told him there was a man inside bleeding because he had been stabbed; that the person in the car in the corner of the parking lot was involved in the fight; that he went to the vehicle and the man sitting in the car said he was waiting on his brother as he was being detained; that he asked the man if he was involved; and, that the man denied any involvement. Sergeant Nicol testified that he noticed a bat lying on the floor next to the driver's seat; that when he asked the man in the car about the bat, the man responded they brought it for protection because there was trouble at Little Tony's. Sergeant Nicol identified the man in the car as Shoopman, who

asked if he could get out and talk to Officer Murray. Sergeant Nicol then testified that he continued his investigation by returning to the inside of Little Tony's where the witnesses told him that the man he was talking to was the guy that got in the fight and stabbed Neely; the witnesses identified him as wearing a confederate baseball cap; that no one else at Little Tony's had a confederate cap on; that he then told Officer Murray that that was the suspect and to detain him; and, that he saw the individual who had been stabbed and took pictures of the wound at the hospital.

{¶16} On cross examination Sergeant Nicol testified that he did not see any blood on Shoopman upon his arrival to Little Tony's.

{¶17} Officer Chris Diehl testified that he was working for the City of Marysville from midnight until 8:00 A.M. on February 22, 2009; that he responded to the call regarding the incident at Little Tony's; that when he arrived he saw Officer Murray had one man in the back of his cruiser and was talking to another man who was wearing a tank top and a hat with a confederate flag on it; that he searched Shoopman's vehicle and the surrounding area for a knife; that neither he nor the other officers located a knife that night, but that they did not search the lot adjoining Little Tony's; that he found a baseball bat and a box cutter knife in the car in which Shoopman was sitting; that once he was back at the police station he took Shoopman's witness statement; that Shoopman wrote in the witness statement that the knife was Neely's; that Neely stabbed himself; that on

the morning of February 23, 2009, he and Patrolman Murray went back to Little Tony's, and searched the front yard of the adjoining lot; that they found a knife; and, that the knife's handle had holes in it and was not flat which made it difficult to search for prints.

{¶18} On cross examination Officer Diehl testified that Shoopman's witness statement did not say that Neely stabbed himself but rather, that Neely had a knife; that he did not see any blood on Shoopman or in his car; that the knife they did find was halfway opened in a V-shape; and, that he never attempted to get fingerprints off of the knife.

{¶19} Officer Murray of the Marysville Police testified that he was on duty the night of February 21 and 22, 2009; that he responded to the call at Little Tony's; that he was the first to respond; that when he arrived there was a large group of people yelling and screaming in front of Little Tony's; that a person was standing near the blue vehicle parked in the corner of the parking lot; that another person was walking in his direction; that people told him that the person who was walking toward the vehicle was involved in a fight; that somebody had been stabbed; that he took custody of Gray; that Gray was wearing blue jeans and a hoodie; that the subject in the corner of the parking lot was wearing a tank top and a baseball cap with a rebel flag; that the individual was the defendant; that Shoopman told him that he was involved in a fight with Neely and that Neely had a knife and attempted to use it on Shoopman, but in the process stabbed himself;

that Shoopman believed someone took the knife back into Little Tony's; that they searched for a knife around the building and the surrounding area but did not find one; and, that on the morning of February 23, 2009, they found the knife.

{¶20} On cross examination, Officer Murray testified that he looked briefly inside Little Tony's for the knife but did not find it; that he did not tape off the scene; that he searched Shoopman but did not find any knives or blood on him; that he did not find any blood in the car; that he did not attempt to get fingerprints off of the knife because doing so would have been difficult as the knife had holes in it and had been outside all night; and, that the reason he first arrested Gray was because someone had said he was the one with the knife.

{¶21} The defense called its first witness, Matthew Cook. Cook testified that he was working at Little Tony's on the night in question as a server and bartender; that there was a fight between Gray and Neely on the back patio that night; that Gray's brother came into Little Tony's asking who the fight was between; that he told the police that Gray's brother was carrying a knife; that he was wearing a hoodie with a baseball cap; that he called the police when he realized there was a fight outside in front of the building; that Neely came back in Little Tony's and was bleeding badly; that about five to ten people were in the parking lot; and, that three people were involved in the altercation.

{¶22} On cross examination, Cook testified that he did not actually see anybody get stabbed; that in order to call the police he had to return back inside.

-12-

On redirect examination, Cook testified that he told the police that the person with the knife was wearing a blue hoodie and a camouflage baseball cap.

{¶23} Robert Gray testified that he was at Little Tony's on the night of February 21, 2009; that he had an altercation with Neely; that he left and returned to get his brother because he heard his brother was there to see what had happened; that when he returned, Neely came around, and Shoopman came outside; that those two were talking but it did not seem confrontational; that the police arrived; that his brother did not have a knife that night; that he did not have any other altercation besides the initial one with Neely; that he was arrested and then released; and, that Shoopman is left-handed.

{¶24} On cross examination Gray testified that he had been drinking; that he never had words with a smaller individual; that no one tried to break up an altercation between him and another individual; and, that he never fought with Neely on Little Tony's back patio, but that they went out there to talk. Gray then recanted and testified that he actually did have an altercation with Neely out back; that Clevenger and Cook broke it up; that Clevenger did not evict him from Little Tony's; that when he left the Little Tony's he returned home but his brother was not there; that he returned to Little Tony's to check on his brother; that he did not call his brother; that he could not remember how he knew that his brother had gone to Little Tony's; that Clevenger was wrong in her testimony that two people got out of the car because Shoopman was already at Little Tony's; that Shoopman

does not drive; that he did not bring Shoopman to Little Tony's; that Shoopman must have found a ride to Little Tony's; that he never saw an altercation between Shoopman and Neely; that he did not prevent Clevenger from going back in Little Tony's to call the police; that he was only talking to Clevenger; and, that Shoopman came out of Little Tony's and walked past him. Gray also testified that in his written statement to the police, that Clevenger was poking him in the chest and face; and, that he and his brother headed back to his vehicle together.

{¶25} Jackie Shoopman testified that he asked a neighbor for a ride to Little Tony's on the night of February 21, 2009, because he received a phone call saying that men were harassing Gray; that when he went to Little Tony's to inquire about the man harassing Gray; that he and Neely exchanged words; that he went to the bathroom and when he came out Neely was gone; that Gray came back into Little Tony's; that he saw Clevenger slap, poke, and yell at Gray; that he went outside and saw Neely come around the corner; that he walked past Gray to the middle of the parking lot; that five to seven guys came around the corner with Neely; that Neely had a knife; that he kicked the knife; that he fought with Neely; that another guy had a knife and came near, swinging it; that he wrestled with the second guy with a knife; that he heard sirens and everyone scattered; that he walked over to Gray's car; that everyone said that Gray stabbed somebody; that the police arrested Gray; that another policeman questioned Shoopman and then searched the

area; that the police released Gray; that he was taken to the police station where he filled out a report; and, that the police then released him.

{¶26} On cross examination Shoopman testified that Gray's neighbor gave him a ride to Little Tony's on February 22, 2009 at about 1:00 A.M.; that he was wearing a gray tank top and a rebel hat; that he also had on a long-sleeved shirt but that he took it off when he got out of Gray's car because it restricts his movement when he fights; that Neely threw the first punch; that Neely threw the knife at him in a swinging motion; that he kicked the knife out of Neely's hand; that Neely continued to come at him; that they exchanged a couple of blows; and, that the other man with the knife approached Neely and tried to swing. Shoopman also testified that he said nothing to Sergeant Nicol when he questioned him about what had happened; that although he claims he was the victim, he did not report anything to the police; that he told the police he believed the knife went back into Little Tony's despite the fact that he kicked it out of Neely's hand. Shoopman also testified that he has had a prior assault conviction; that he had a domestic violence charge that was dropped; that he was involved in power boxing and martial arts; and, that he trains at home with a 100 pound punching bag.

{¶27} In rebuttal, State called Officer Murray who testified that when he questioned Shoopman upon his arrest, Shoopman stated that Neely stabbed himself; that Neely started the fight; that Neely had attacked Shoopman; that

Shoopman never said anything about kicking the knife out of Neely's hand; and, that there was no indication of multiple attacks on Shoopman.

{¶28} Thereafter, the defense rested. The jury returned unanimous verdicts finding Shoopman guilty of felonious assault and tampering with evidence. Subsequently, the trial court sentenced Shoopman to a six-year prison term on Count One, and a two year prison term on Count Two, to be served concurrently, for a total of six-years in prison. The trial court also ordered Shoopman to pay restitution and imposed post-release control of three-years commencing upon his release from prison.

{¶29} It is from this judgment that Shoopman appeals, presenting the following assignment of error for our review.

### Assignment of Error No. I

**THE JURY LOST ITS WAY WHEN REVIEWING THE EVIDENCE, RESULTING IN VERDICTS THAT ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED.**

{¶30} Shoopman argues that his convictions were against the manifest weight of the evidence. Specifically, he contends that the prosecution has not met its burden to show every element of felonious assault and tampering with evidence beyond a reasonable doubt due to conflicting evidence and lack of direct evidence. We disagree.

**{¶31}** When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by constitutional amendment on other grounds as stated by *State v. Smith,* 80 Ohio St.3d 89, 1997-Ohio-335, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

**{¶32}** In the present case Shoopman argues that the prosecution did not meet its burden due to two deficiencies, namely that: 1) there was a lack of direct evidence to show that Shoopman committed the crimes as no knife or blood was found on him, and that the knife was not found until twenty-four hours later in an unsecured crime scene; and 2) there was conflicting evidence that calls every element of both offenses into question.

**{¶33} Felonious Assault**

**{¶34}** Shoopman was indicted on one count of felonious assault under R.C. 2903.11(A)(2), which provides:

**(A)     No person shall knowingly do either of the following . . . 2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance.**

{¶35} It is a well-settled rule of law that direct evidence is not necessary for the trier of fact to make a finding; circumstantial evidence has the same probative value.

**Direct evidence is "evidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary (8 Ed.2004) 596. Circumstantial evidence is "evidence based on inference and not on personal knowledge or observation." *Id.* at 595. Additionally, circumstantial evidence has been defined as "the proof of certain facts and circumstances in a given case, from which the jury may infer other connected facts which usually and reasonably follow according to the common experience of mankind." *State v. Duganitz* (1991), 76 Ohio App.3d 363, 367, 601 N.E.2d 642, citing Black's Law Dictionary (5 Ed.1979) 221.**

**Direct evidence of a fact is not a prerequisite for a trial court to make a finding of that fact. See *State v. Lott* (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293; *Michalic v. Cleveland Tankers, Inc.* . (1960), 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20. In fact, circumstantial evidence and direct evidence have the same probative value, *State v. Gillman,* 3d Dist. No. 14-08-08, 2008-Ohio-2606, ¶ 17, and "'[c]ircumstantial evidence * * * may also be more certain, satisfying and persuasive than direct evidence.'" *Lott,* 51 Ohio St.3d at 167, 555 N.E.2d 293, quoting *Michalic,* 364 U.S. at 330. Furthermore, "[w]hen the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction." *State v. Williams,* 73 Ohio St.3d 153, 165, 652 N.E.2d 721, 1995-Ohio-275 (internal citations omitted).**

*State v. Fisher*, 3d Dist. No. 02-10-09, 2010-Ohio-5192, ¶26, 27. Therefore, the lack of direct evidence in this case does not warrant reversal. Several courts of appeal have affirmed felonious assault cases when there was a lack of direct evidence. See e.g., *State v. Martin*, 10th Dist. No. 10AP-295, 2010-Ohio-5968 (affirming the conviction for felonious assault although no blood was found in the apartment where bleeding occurred); *State v. Berrien*, 12th Dist. No. CA 2005-08-18, 2006-Ohio-4563 (affirming the conviction for felonious assault although no blood was found on defendant's clothing when he was taken into custody and defendant's fingerprints were not found on the knife); *State v. Talley*, 7th Dist. No. 97 CA 72, 1998 WL 811347 *(*affirming conviction for felonious assault although no blood or fingerprints were found on the knife); *State v. Seymour* (1996), 1st Dist. No. C-960276, 1996 WL 733148 (affirming conviction for felonious assault although no blood was found on defendant's clothing).

{¶36} At trial, seven witnesses, including Shoopman himself, testified that Shoopman was wearing a tank top and a rebel hat on the night in question. These witnesses also testified that the man involved in the fight with Neely was wearing a tank top and a rebel hat. Shoopman testified that he went to Little Tony's to inquire about the man who got into a fight with his brother and that he took off his long-sleeved shirt as it restricts him if he is going to fight. Not one witness testified that anyone else was wearing a tank top on February 21 and 22, 2009. With the overwhelming amount of evidence that Shoopman had gone to Little

Tony's to look for Neely, and that Shoopman was identified as and admitted to being the one in the fight with Neely, the manifest weight of the evidence showed that Shoopman was looking for and fought with Neely.

{¶37} Further, the State clearly established that Neely experienced serious physical harm caused by the knife the police found. Neely's treating physicians testified that his wound was a very deep, serious wound that could have caused life-threatening injuries had it traveled in a different direction. The parties stipulated that the knife recovered at the scene contained Neely's blood. Both expert-physicians testified that the knife in question could have caused Neely's wound and that a knife can cause death.

{¶38} There is, however, conflicting testimony regarding who stabbed Neely. McClincy and Neely testified that, in the fight between Neely and Shoopman, Shoopman threw the one and only blow; the blow to Neely's left shoulder. McClincy, Neely, and Clevenger testified that Neely then fell to the ground and went immediately inside. Shoopman, however, testified that Neely had a knife; that he kicked it out of Neely's hand; that a third unknown person had a knife and lunged into the tussle and stabbed Neely. There was also evidence that Shoopman told the police that Neely stabbed himself.

{¶39} The inconsistencies between State's case and Defendant's case alone do not entitle Defendant to a reversal on manifest weight grounds. *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶21. The trier of fact is in the best

position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. *State v. Williams,* 10th Dist. No. 02AP-35, 2002-Ohio-4503. The trier of fact is free to believe or disbelieve all or any of the testimony. *State v. Jackson,* 10th Dist. No. 01AP-973, 2002-Ohio-1257, ¶1. Although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility. *State v. Covington,* 10th Dist. No. 02AP-245, 2002-Ohio-7037, ¶28. Here, the jury heard all of the evidence, weighed the witness' credibility, and ultimately convicted Shoopman. The jury was clearly within its province to weigh the testimony as it found appropriate; this is not the exceptional case where the jury lost its way. Accordingly, we affirm the conviction for felonious assault.

**{¶40} Tampering with Evidence**

**{¶41}** Shoopman was indicted on one count of tampering with evidence under R.C. 2921.12(A)(1), which provides:

> **(A)    No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following: (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation**

{¶42} At trial, Amsbaugh testified that he saw a man in a tank top walk towards the corner of the parking lot with something shiny in his hand that looked like a knife. He saw this man make an overhand throwing motion toward the road. He informed police officers to look across the road. The knife was later found in the general area toward which the individual in the tank top was facing when he made the throwing motion. No evidence contradicted this testimony. For the reasons outlined above, the jury was in the best position to evaluate the evidence. The guilty verdict was not against the manifest weight of the evidence. We, therefore, affirm the conviction for tampering with evidence.

{¶43} Accordingly, we overrule Shoopman's sole assignment of error.

{¶44} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW and PRESTON, J.J., concur.**
**/jnc**