In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2659

DUAL-TEMP OF ILLINOIS, INC.,

*Plaintiff-Appellee,*

*v.*

HENCH CONTROL, INC. and CAESAR-VERONA, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:09-CV-595 — **Sharon Johnson Coleman**, *Judge*.

ARGUED MARCH 29, 2016 — DECIDED MAY 6, 2016

Before FLAUM, EASTERBROOK, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Hench Control Corporation ("Hench I"), the predecessor to defendants Hench Control, Inc. ("Hench II") and Caesar-Verona, Inc., contracted with plaintiff Dual-Temp of Illinois, Inc. to supply a refrigeration control system. However, the Hench refrigeration control system delivered to Dual-Temp did not work properly, and Dual-Temp brought suit against defendants for breach of contract. After a bench trial, the district court held that defendants had

breached the contract and awarded damages and attorneys' fees to Dual-Temp. Defendants appeal. We affirm the district court's conclusion that defendants breached the contract and its award of damages.

## I. Background

### A. Factual Background

Dual-Temp is a refrigeration contractor that installs refrigeration systems. A crucial component of a refrigeration system is the refrigeration control system ("RCS"), which regulates the temperature, humidity, and ammonia levels in the refrigeration system and controls related equipment such as compressors and condensers. The RCS must maintain communication with the rest of the refrigeration system to function properly.

In 2006, Home Run Inn Pizza began the expansion of its pizza manufacturing facility and hired Milord Company as a general contractor. Milord subcontracted with Dual-Temp to update Home Run Inn's refrigeration system. Dual-Temp solicited bids from several companies to design an RCS for integration into Home Run Inn's refrigeration system.

Hench I submitted a bid to supply an RCS to Dual-Temp. Dual-Temp accepted this bid and issued a purchase order on October 20, 2006. The purchase order states, in relevant part, that the Hench RSC was to "meet design specifications and function (1) as called for in the plans, specifications or addenda, (2) as herein set forth, and (3) as published or warranted by the manufacturer for the equipment involved." The purchase order also states that "[i]n the event that [the Hench RCS] does not meet the foregoing requirements, [defendants]

shall immediately, upon notice, replace or repair same or remedy any deficiency without expense to [Dual-Temp]." The parties do not dispute that Dual-Temp and Hench I entered into a valid contract and were bound by the terms of the purchase order.

On February 28, 2007, Caesar-Verona acquired Hench I and proceeded to do business as Hench Control, Inc. ("Hench II"). The district court found that Caesar-Verona and Hench II implicitly assumed Hench I's liability on the Dual-Temp contract. The parties do not appeal this finding.

The Hench RCS components were shipped to Dual-Temp beginning in January 2007. At the end of March 2007, Dual-Temp received additional RCS parts. Dual-Temp's affiliate, Spur Electric, Inc., installed the RCS at the Home Run Inn facility. Dual-Temp asserts that problems arose with the RCS immediately upon installation. For instance, Dual-Temp discovered that the wiring diagrams for the RCS were mislabeled. Defendants sent replacement diagrams, but these were also incorrect. Defendants eventually sent the correct diagrams. Defendants also sent Dual-Temp a computer with incorrect software but corrected this error as well.

After installing the RCS, Dual-Temp had to connect it to the refrigeration system in the Home Run Inn facility, a process referred to as "startup." In May 2007, defendants sent their technician, Steve Halvorsen, to assist with startup. Shortly after startup, the RCS began having frequent communication failures. This problem persisted for months and was never resolved. A functional RCS would have been able to communicate with the refrigeration system to control all parts of the refrigeration system. Dual-Temp and defendants sent

technicians to troubleshoot the problem, but their efforts were unsuccessful.

On April 29, 2008, Milord demanded that Dual-Temp replace the Hench RCS. In May 2008, Dual-Temp paid Select Technologies, Inc. $113,500 to remove the Hench RCS and to design, build, and install a replacement RCS. Dual-Temp asserts that the new Select Technologies RCS has been operating and communicating properly since installation.

## B.  Procedural Background

On January 30, 2009, Dual-Temp filed suit alleging that Hench I, Hench II, and Caesar-Verona breached the contract with Dual-Temp to provide an operational RCS. Dual-Temp contended that the Hench RCS was defective because it intermittently lost communication with the refrigeration system.

The district court conducted a bench trial in January 2014. At trial, Dual-Temp relied on circumstantial evidence that defendants supplied a defective RCS. Defendants presented the expert testimony of Ron Vallort, an expert in the area of refrigeration control. Vallort testified that external factors could have caused the communication failures and that in his opinion, the Hench RCS was not necessarily defective. According to Vallort, other potential explanations for the communication losses included installation errors, problems with the conditions at the Home Run Inn facility, flawed wiring work done by Spur Electric during installation, a faulty humidistat, disruptive radio waves, power surges and voltage drops, design flaws in the refrigeration system, or continual additions and modifications. Vallort stated that "the cause or causes of the communication failures cannot be determined within a reasonable degree of certainty." Vallort also testified that these

other factors could have damaged the Hench RCS, and that this damage could have continued to cause communication failures, even if the damage-causing condition was later corrected.

On September 30, 2014, the district court entered judgment in favor of Dual-Temp, holding Hench I, Hench II, and Caesar-Verona jointly and severally liable in the amount of $113,500 (the amount Dual-Temp paid Select Technologies for the replacement RCS) plus interest and attorneys' fees. Hench II and Caesar-Verona appeal the judgment of the district court.[1]

## II. Discussion

On appeal, defendants argue that the evidence presented at trial was not sufficient to permit a reasonable trier of fact to find that defendants breached the contract. Following a bench trial, we review the district court's legal conclusions de novo and its factual findings for clear error. *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 379 (7th Cir. 2010). "[D]ue regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting Fed. R. Civ. P. 52(a)) (internal quotation marks omitted). To prevail on its breach of contract claim, Dual-Temp must demonstrate: (1) the existence of a valid and enforceable contract; (2) substantial performance by the Dual-

---

[1] Hench I did not appeal. Defendants originally appealed the award of attorneys' fees. However, defendants later conceded that this Court does not have appellate jurisdiction over this issue because the attorneys' fee award has not yet been quantified and thus is not a final appealable order. *McCarter v. Ret. Plan for Dist. Managers of Am. Family Ins. Grp.*, 540 F.3d 649, 654 (7th Cir. 2008).

Temp; (3) a breach by defendants; and (4) resultant damages. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (applying Illinois law). The only element defendants challenge on appeal is whether a breach occurred.

The district court found that defendants breached the contract because the purchase order stated that defendants were to supply an RCS "to meet requirements of plan and specifications," and the Hench RCS did not meet this requirement since it could not properly communicate with the refrigeration system. On appeal, defendants contend that the evidence was insufficient to establish breach. They make two arguments: one based on Vallort's expert testimony, and one based on the timing of the communication failures. We do not find either argument persuasive.

First, defendants argue that they presented evidence of an equally plausible cause of the communication failures—Vallort's testimony that external factors caused the communication failures—and thus, there was not sufficient evidence for the district court to find breach. According to defendants, the district court accepted Vallort's testimony and found that it was equally plausible that the communication failures were caused by external factors and not by a defect in the RCS. This argument fails because it mischaracterizes the district court's opinion. The court stated: "[Defendants] argue [they] put forward an equally plausible explanation for the communication losses—namely Vallort's expert testimony … ." The district court neither accepted Vallort's testimony nor stated that it found his theory to be equally plausible.

Defendants insist that the district court accepted Vallort's testimony when the court found unavailing Dual-Temp's efforts to discredit Vallort by pointing out that he was on pain

medication and recovering from surgery while preparing his report. But the fact that the district court was unpersuaded by Dual-Temp's attacks on Vallort's "state of mind and instinctual rigor" does not mean that the court found Vallort's theory as persuasive as Dual-Temp's theory of breach. Although the court did not find Vallort's health issues, standing alone, to be sufficient to discredit his testimony, it was still within the role of the district court to consider Vallort's overall credibility and weigh his testimony against other theories posited at trial. *See Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1068 (7th Cir. 2013) (noting that in a bench trial, the district court judge must determine the credibility of expert witnesses and that credibility determinations are findings of fact reviewed for clear error). Defendants have not shown that the district court's credibility determinations were clearly erroneous.

In any event, there is no evidence supporting Vallort's speculation that the communication failures were caused by external factors. And Vallort did not testify that the communication failures were actually caused by one or more of the external factors. He merely offered them as theoretical alternatives to breach and stated that "the cause or causes of the communication failures cannot be determined within a reasonable degree of certainty." Thus, we are not convinced by defendants' contention that the parties' alternative explanations—Dual-Temp's argument that the RCS was defective and defendants' argument that external factors caused the communication failures—are in equipoise.

In contrast to defendants' lack of evidence supporting Vallort's speculation, there is sufficient circumstantial evidence for a reasonable factfinder to conclude that the communication failures were caused by a defect in the Hench RCS. *See*

*Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) (noting that direct evidence of a fact is not required and that circumstantial evidence can be sufficient). Dual-Temp experienced problems with the Hench RCS from the start, the communication failures of the Hench RCS were never fixed, and the communication failures ceased once the Hench RCS was replaced with the Select Technologies RCS. At trial, Dual-Temp presented evidence that it worked with Spur Electric to determine whether external factors interfered with the RCS communication and found that they did not.[2] Additionally, Milord independently contracted with AMS Mechanical Systems, Inc., an independent mechanical contractor, to review and troubleshoot the Hench RCS. AMS Mechanical Systems concluded that the communication failures were caused by the Color Master, which is a software component of the Hench system. Given this evidence, a reasonable trier of fact could properly find that the communication failures were caused by a defect in the RCS and not by external factors.

---

[2] At trial, the Vice President of Spur Electric testified that the wiring had been installed according to Hench's standards. Dual-Temp also contends that the Select Technologies' replacement RCS used the same wiring as the Hench RCS. A former Dual-Temp employee testified that he tried to alleviate the communication problems by checking the communication cable between the compressors and the panels, examining the grounding of the electrical system, and making sure that nobody was using a two-way radio at the installation site that might cause radio wave interference, but that his efforts did not fix the communication issues. Though one technician hired by defendants suggested that a faulty humidistat might have caused the problem, a former Dual-Temp employee testified that the humidistat was replaced and had not affected the communication problems.

Defendants' second argument is that there is evidence that the RCS functioned properly for one month before the communication problems started, and therefore it is more likely that something happened during the first month—a power surge, for instance—that damaged the RCS and caused the communication failures. In support of this argument, defendants point to the testimony of Milord's principal stating that the RCS began experiencing communication problems "within a few weeks after turning the system on." Defendants also emphasize the testimony of Home Run Inn maintenance manager, Joe Bures, who stated that the communication problems began within a month after installation.

However, defendants seem to confuse installation with startup. Installation occurred from the end of March through April 2007. After installation, the RCS still had to be connected to the refrigeration system through startup. Defendants' installation technician assisted with startup in May 2007. The communication failures also began in May 2007, shortly after startup, and about one month after installation. Additionally, the RCS had to be connected to the refrigeration system through startup in order to communicate with the refrigeration system. Thus, the communication failures could not have commenced prior to startup. Finally, even if we assume for the sake of argument that the Hench RCS did operate properly for some time after startup, there is sufficient circumstantial evidence, as discussed above, for a reasonable factfinder to conclude that the communication failures were caused by a defect in the Hench RCS. Therefore, the district court properly concluded that defendants breached the contract.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's conclusion that defendants breached the contract and its award of damages.