[Cite as *State v. Morris*, 2019-Ohio-3184.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                             :

    Plaintiff-Appellee,            :

                                      No. 107674

    v.                               :

DEL RICCO D. MORRIS,                      :

    Defendant-Appellant.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** August 8, 2019

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-617940-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kelly Needham, Assistant Prosecuting Attorney, *for appellee.*

Kelly Zacharias, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Del Ricco Morris ("Morris"), appeals from his convictions following a bench trial. He raises the following assignments of error for review:

1. The trial court was without jurisdiction to conduct a bench trial because the requirements of R.C. 2945.05 were not strictly followed.

2. Insufficient evidence supported appellant's convictions.

3. Appellant's convictions are against the manifest weight of the evidence.

{¶ 2} After careful review of the record and relevant case law, we affirm Morris's convictions and sentence.

## I. Procedural and Factual History

{¶ 3} In June 2017, Morris and his codefendants, Denzel Carr ("Denzel") and Rai'Shoun Morris ("Rai'Shoun"), were named in a 14-count indictment, charging them each with aggravated robbery in violation of R.C. 2911.01(A)(1), with one- and three-year firearm specifications (Count 1); robbery in violation of R.C. 2911.02(A)(1), with one- and three-year firearm specifications (Count 2); robbery in violation of R.C. 2911.02(A)(2), with one- and three-year firearm specifications (Counts 3-6); robbery in violation of R.C. 2911.02(A)(3), with one- and three-year firearm specifications (Counts 7-10); and kidnapping in violation of R.C. 2905.01(A)(2), with one- and three-year firearm specifications (Counts 11-14). The charges brought against Morris stemmed from allegations that he participated in the armed robbery of a jewelry store located in Richmond Heights, Ohio.

{¶ 4} In February 2018, Morris pleaded guilty to aggravated robbery and kidnapping, as amended in Counts 1 and 11 of the indictment. The remaining counts were nolled. Prior to the imposition of a sentence, however, Morris filed a motion

to withdraw his plea. The trial court granted Morris's motion to withdraw and the matter was scheduled for trial.

{¶ 5} In August 2018, Morris appeared before the court and executed a written waiver of his right to a trial by jury. In open court, Morris orally confirmed that he signed the written waiver, that he understood the rights he was waiving, and that it was his desire to waive a jury trial. The matter then proceeded to a bench trial, where the following evidence was adduced.

{¶ 6} On May 22, 2017, Susan Kozlowski, Steve Kozlowski, Erica Hollar, Sydney Givens, and Bill Mavrakis ("Mavrakis") were working at Sands Jewelry Company in Richmond Heights, Ohio. At approximately 4:19 p.m., two masked men entered the store with guns. Video footage of the incident was captured by the store's surveillance cameras.

{¶ 7} Erica Hollar testified that she was working in the store's main showroom at the time of the incident. Hollar stated that when the masked men walked inside the store, she noticed that each man had a gun. Hollar described the first man as "a thin-build black man with a mask on, dark clothes." She testified that the second masked man was wearing "a very similar ensemble" and was approximately the same height as the first man. Hollar estimated that the men were "young adults."

{¶ 8} Hollar testified that when she encountered the masked men, she "froze because they were saying, Don't move." Hollar stated that one of the men then pointed his gun at her and ordered her to get on the ground. Hollar testified

that she was terrified and stayed on the ground and faced the wall until her boss, Susan Kozlowski, told her to run out of the store. Hollar did not observe anything while she was facing the wall, but heard one of the individuals tell Mrs. Kozlowski "you have to give us something or we're going to shoot somebody."

{¶ 9} Mrs. Kozlowski is the co-owner of the jewelry store. She testified that at approximately 4:19 p.m. on May 22, 2017, she was working in the jewelry store when she heard a commotion and saw her husband, Steven Kozlowski, running towards the back of the building. Mrs. Kozlowski testified that when she realized the store was being robbed, she confronted one of the masked men and yelled at him to get out of her store. As the robbery was occurring, Mrs. Kozlowski observed Hollar "on her knees with her hands over her head to protect herself." Mrs. Kozlowski also observed another store employee, Sydney Givens, hiding under a table. When one of the masked men pointed his gun at the back of Hollar's head, Mrs. Kozlowski attempted to persuade him that it was "not worth killing somebody over this." The masked man responded, "I'm going to get me some." Despite this threat, Mrs. Kozlowski boldly told the masked man that they "aren't going to get a thing." Ultimately, the masked men fled the scene without taking any of the store's property.

{¶ 10} Mrs. Kozlowski testified that the masked men were African-American. She further stated that "they were just wearing dark, head to toe, and something over their faces." Mrs. Kozlowski testified that the gun she observed pointed at Hollar was "a silver color." However, Mrs. Kozlowski admitted that she

was not wearing her eyeglasses at the time of the robbery and, therefore, was not able to see the two men clearly.

{¶ 11} Steven Kozlowski testified that on the day of the incident, he was working in the front main showroom of the store with Hollar and Givens. Mr. Kozlowski testified that he began to walk towards the back of the store to speak with Mrs. Kozlowski when he was suddenly confronted by a masked man holding a gun. Mr. Kozlowski testified that he saw two masked men in the store and that both men were in possession of a gun. One of the masked men pointed a gun directly at Mr. Kozlowski and stated, "Don't move, don't move." Despite the masked man's directives, however, Mr. Kozlowki ran down the hallway towards the back of the building. Once inside a secure location, Mr. Kozlowski called 911. The 911 call was played during trial.

{¶ 12} While standing by the backdoor of the store, Mr. Kozlowski noticed a suspicious car that was parked near the back of the property that "certainly didn't belong there." Mr. Kozlowski suspected the car was the "get-away car" and had store employee, Bill Mavrakis, take photographs of the car and its license plate. While this was occurring, Mr. Kozlowski suddenly observed "the two guys walk right by us fairly slowly, masks are off." Mr. Kozlowski clarified that his statement regarding "the two guys" referred to "the two guys that were in the store with the guns." Mr. Kozlowski explained that he was able to identify the men as the masked robbers because "they had masks and they were dressed exactly the same." Mr. Kozlowski noted their dark clothing, their gloves, and the stripe on one of the men's pants. Mr.

Kozlowski further stated that he could see that the men still had their masks and that they attempted to "try to make a move to put [their] masks back up" once they noticed Mr. Kozlowski and Mavrakis. Mr. Kozlowski testified that he was able to get a good look at one of the individuals, whom he identified in court as being Morris. In addition, Mr. Kozlowski expressed that he was confident Morris was the individual who pointed a gun at him inside the jewelry store because the perpetrator's face was only covered from his nose down, and Morris has "very distinctive eyes."

{¶ 13} When the two men "started to run" from the scene, Mavrakis immediately began chasing them on foot. At that point, Mr. Kozlowski got into his own vehicle and followed the two men as they ran. Mr. Kozlowski testified that he observed the men get into a "gold colored car" that was driven by a third individual. Mr. Kozlowski stated that he provided the 911 dispatcher the license plate number of the gold car and proceeded to follow the gold car through the streets of Cleveland until he was ordered by the police to stand down.

{¶ 14} Mavrakis testified that he was working as an independent contractor at the jewelry store on May 22, 2017. During the robbery, Mavrakis was located in the rear repair shop of the store with Mrs. Kozlowski. Mavrakis testified that he and Mrs. Kozlowski "heard a noise" and saw Mr. Kozlowski "running down the hallway, which was very odd." When they went to the nearby hallway to investigate, Mavrakis observed a masked man with a gun. Mavrakis testified that while Mrs. Kozlowski was confronting a masked man, Mr. Kozlowski grabbed him, took him outside, and

stated, "We're being robbed." Once outside, Mavrakis took photographs of a suspicious vehicle. Shortly thereafter, Mavrakis observed a man walking near the back of the property. Mavrakis testified that he "assumed" that the man he observed walking was the masked gunman he previously observed in the store. Mavrakis testified that the man was not wearing the mask over his face at that time. However, when the man noticed Mavrakis, "he pulled a mask back onto his head." Mavrakis stated that the man "was struggling to pull it (the mask) on because he still had the gun in his hand." Mavrakis stated that a second individual joined the walking man several seconds later. Once the men noticed Mavrakis, "they both ran." Mavrakis attempted to chase after them but quickly "lost track of them."

{¶ 15} Detective Charles Duffy of the City of Richmond Heights Police Department, testified that he was assigned to investigate the jewelry store robbery. In the course of his investigation, Det. Duffy used the license plate number provided by Mr. Kozlowski to determine that the gold car was registered to Lamar Carr. Upon contacting Carr, Det. Duffy learned that either Carr's parents or brother, codefendant Denzel Carr, were in possession of the car on the day of the robbery. Det. Duffy testified that Lamar Carr provided him with Denzel's cell-phone number. In turn, Det. Duffy contacted Denzel's cell-phone provider and "sent an exigent circumstance request for immediate pings and traces on that cell phone." Shortly thereafter, the cell-phone provider sent Det. Duffy "longitude and latitude pings from [Denzel's] cell phone" which led to the recovery of the unoccupied vehicle in Cleveland, Ohio.

{¶ 16} Denzel was eventually brought into the police station by his father. Det. Duffy testified that Denzel provided an alibi and indicated that he had previously reported the vehicle as stolen. However, after Denzel was released, Det. Duffy investigated Denzel's alibi and determined that his statements were false. Accordingly, Det. Duffy issued a warrant for Denzel's arrest.

{¶ 17} When Denzel was arrested several days later, he provided a second written statement to Det. Duffy, implicating Rai'Shoun Morris and Morris as the two men who robbed the jewelry store. Following Denzel's arrest, Det. Duffy obtained a search warrant to conduct a forensic examination of Denzel's cell phone. In addition, Det. Duffy used information provided by Denzel to locate a cell phone behind Denzel's home that was "believed to be [Morris's] phone." Det. Duffy testified that he also obtained a warrant to have Morris's cell phone manually searched.

{¶ 18} At that point, Det. Duffy was able to see the text message and call records from Denzel and Morris's personal cell phones. Det. Duffy testified that the phone records corroborated Denzel's statement that he had conversations with Morris leading up to the robbery. Relevant to this appeal, the following text messages were exchanged between Denzel and Morris:

DENZEL: gotchu [May 21, 2017 at 10:49 a.m.]

MORRIS: Ima bless you. You tryna drive me to hit this lick on Monday? [May 21, 2017 at 10:49 a.m.]

DENZEL: Lee Road. Where the play at? [May 22, 2017 at 11:06 a.m.]

MORRIS: In Richmond it's for the bands too. [May 22, 2017 at 11:22 a.m.]

DENZEL: Wya [May 22, 2017 at 1:25 p.m.]

MORRIS: My bad I was on the toilet lol here I come. [May 22, 2017 at 1:25 p.m.]

DENZEL: lol bet [May 22, 2017 at 1:25 p.m.]

{¶ 19} Det. Duffy testified that the term "bands" refers to a large amount of money. He further testified that the terms "play" or "lick" refer to criminal activity, and that Denzel's use of the term "bet" meant he and Morris had a deal.

{¶ 20} Det. Duffy also testified about a series of text messages sent between Morris and an individual listed as "Lil Bit." In a text message sent at 4:11 p.m. on May 22, 2017, Lil Bit asked Morris "where's my gun at?" Just before the robbery occurred, Morris responded, "I'm on my way. Where you at[?]" and "It took a minute." Morris also received a text message on May 19, 2017, from a person listed as "Momma Digga" asking "you got my gun rico [sic]?" In addition, the phone records reflect that after the robbery occurred, Denzel received a text message on May 22, 2017, at 5:02 p.m. from Rai'Shoun's cell phone that stated, "Call me this Ricco." At 5:03 p.m., Denzel called Rai'Shoun's cell phone.

{¶ 21} Det. Duffy then provided extensive testimony concerning the information he gathered from the data obtained from his exigent circumstances request. Using cell-phone tower pings from Denzel's cell phone, Det. Duffy was able to construct a map of his travel on May 22, 2017. In summary, Det. Duffy testified that during a time period immediately following the robbery, the cell phone ping

data indicated that Denzel's phone traveled "from Richmond Heights westbound towards Cleveland in the direction of where Denzel said he dropped off [Morris] and his brother. And then from there they headed in an easterly direction towards Warrensville Heights to where [Denzel's] vehicle was recovered."

{¶ 22} In the course of his investigation, Det. Duffy also obtained and reviewed surveillance footage taken from inside the jewelry store during the robbery. A still photograph of one of the masked men was generated from the video footage. Det. Duffy testified that he was able to identify Morris as the masked man based on Morris's distinct eyes, forehead, and hairline.

{¶ 23} Following his investigation, Det. Duffy obtained warrants for the arrest of Morris and his brother, Rai'Shoun. When Rai'Shoun was brought into the police station, he denied having any involvement in the robbery. At trial, Rai'Shoun testified that on the day of the robbery, he left his home to go to a local convenient store. When he came home, he discovered Morris in his bedroom "around five o'clock." Morris had a gun in his hand and asked Rai'Shoun to "hold" the gun for him. Rai'Shoun testified that Morris was upset and agitated, but would not tell Rai'Shoun what was wrong. Morris then asked to borrow Rai'Shoun's cell phone. Rai'Shoun testified that he believed Morris texted Denzel, but that Morris deleted the text message before giving Rai'Shoun his phone back. In addition, Rai'Shoun heard Morris talking on the phone with "somebody." When presented with phone records, Rai'Shoun testified that he did not place any outgoing calls while Morris was in his home.

{¶ 24} During his direct examination, Rai'Shoun admitted that he previously made statements to the police that implicated Morris in the robbery. For instance, he conceded that he told the police "they told me what they did, and after, I kicked both of them out." However, Rai'Shoun testified that when he spoke with the police, he was "nervous and just wanted to get out of the situation that [he] was in." Rai'Shoun denied having any involvement in the robbery and insinuated that the statements he made to the police that were used to implicate Morris were lies.

{¶ 25} Denzel testified on behalf of the state. Denzel testified that he pleaded guilty to offenses for his involvement as the getaway driver of this robbery. However, throughout his direct examination, Denzel denied having any knowledge of the robbery and alleged that his statement to Det. Duffy was the product of coercion.

{¶ 26} With that said, Denzel admitted that on May 22, 2017, he picked up Morris and Rai'Shoun in his vehicle and drove them to the area where the jewelry store is located. He stated that Morris and Rai'Shoun then got out of his car. According to Denzel, he did not know what Morris and Rai'Shoun were planning to do when they left his car. However, he admitted that he "sort of had an idea" and believed it "was going to be a drug deal." When Morris and Rai'Shoun finally returned to his car, they were being followed by a truck. Denzel testified that the truck followed them until he managed to lose the truck on the freeway. After Denzel dropped Morris and Rai'Shoun off, Denzel noticed that someone had left a cell phone in his car. Denzel stated that he threw the cell phone in the back yard of his house "just in case."

{¶ 27} Morris testified on his own behalf. At all times, Morris has denied participating in the robbery of the jewelry store. However, Morris admitted that he was with Denzel on May 22, 2017. Regarding their text message conversations, Morris stated that he and Denzel orchestrated a plan to burglarize the home of a local drug dealer. Morris testified that the plan stalled when he told Denzel that he did not want to rob the drug dealer at gunpoint. Although Morris admitted that he had a gun in his possession that day, he testified that it was not in his nature to rob someone at gunpoint. According to Morris, Denzel became very upset when he refused to participate in the armed robbery. He stated that he got out of Denzel's car to avoid a confrontation, but accidently left his cell phone inside Denzel's car. Morris testified that he later used his brother's cell phone to call Denzel in the attempt to retrieve his phone from Denzel. Morris testified that he was not in Richmond Heights on the day of the jewelry store robbery and that Denzel never returned his cell phone.

{¶ 28} At the conclusion of trial, the court found Morris guilty of all counts and accompanying firearm specifications. He was sentenced to an aggregate 12-year prison term.

{¶ 29} Morris now appeals from his convictions.

## II. Law and Analysis

### A. Jury Waiver

{¶ 30} In his first assignment of error, Morris argues the trial court was without jurisdiction to conduct a bench trial without strictly following the requirements of R.C. 2945.05.

{¶ 31} A criminal defendant's right to a jury trial is guaranteed in the Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5 and 10, of the Ohio Constitution. *State v. Burnside*, 186 Ohio App.3d 733, 2010-Ohio-1235, 930 N.E.2d 372, ¶ 45 (2d Dist.). Regarding serious offenses, an accused may not be deprived of this right unless it is knowingly, intelligently, and voluntarily waived. *See Duncan v. Louisiana*, 391 U.S. 145, 154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); R.C. 2945.05; Crim.R. 23(A).

{¶ 32} Crim.R. 23(A) provides, in relevant part:

> In serious offense cases the defendant before commencement of the trial may knowingly, intelligently and voluntarily waive in writing his right to trial by jury. Such waiver may also be made during trial with the approval of the court and the consent of the prosecuting attorney.

{¶ 33} R.C. 2945.05 sets forth the manner in which a defendant may waive his or her right to a jury trial. *State v. Lomax*, 114 Ohio St.3d 350, 2007-Ohio-4277, 872 N.E.2d 279, ¶ 6. The statute provides as follows:

> In all criminal cases pending in courts of record in this state, the defendant may waive a trial by jury and be tried by the court without a jury. Such waiver by a defendant, shall be in writing, signed by the defendant, and filed in said cause and made a part of the record thereof. It shall be entitled in the court and cause, and in substance as follows:

"I _____, defendant in the above cause, hereby voluntarily waive and relinquish my right to a trial by jury, and elect to be tried by a Judge of the Court in which the said cause may be pending. I fully understand that under the laws of this state, I have a constitutional right to a trial by jury."

Such waiver of trial by jury must be made in open court after the defendant has been arraigned and has had opportunity to consult with counsel. Such waiver may be withdrawn by the defendant at any time before the commencement of the trial.

{¶ 34} Under the plain language of Section 2945.05, the entirety of a defendant's jury-trial waiver must be in writing. R.C. 2945.05; *Lomax* at ¶ 9. The Ohio Supreme Court explained that "to be valid, a waiver [under Section 2945.05] must meet five conditions. It must be (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court." *Id.*

{¶ 35} The Ohio Supreme has held that, "[a]bsent strict compliance with the requirements of R.C. 2945.05, a trial court lacks jurisdiction to try the defendant without a jury." *State v. Pless*, 74 Ohio St.3d 333, 658 N.E.2d 766 (1996), paragraph one of the syllabus. Although "Ohio courts have declined to find that the language of the waiver must be a verbatim recitation of R.C. 2945.05," the content of the waiver must be in "[s]ubstantial compliance" with the suggested language. *State v. Orr*, 8th Dist. Cuyahoga No. 100841, 2014-Ohio-4680, ¶ 32, quoting *State v. Woodbridge*, 9th Dist. Summit No. 26911, 2014-Ohio-1338, ¶ 6, citing *State v. Webb*, 10th Dist. Franklin No. 10AP-289, 2010-Ohio-6122, ¶ 26-27.

{¶ 36} On appeal, Morris argues his written waiver did not strictly comply with R.C. 2945.05 because it contained language that varied from the language set forth in the statute. Here, Morris's jury waiver provided, in its entirety:

> I, Del Ricco Morris, the Defendant in this cause, hereby voluntarily waive and relinquish my right to a jury by trial, and elect to be tried to a judge of this Court of Common Pleas. I understand that I have a right, under the Constitutions and laws of both the United States and the State of Ohio, to a trial by a jury of twelve, and that no verdict could be made by a jury, except by agreement of all twelve members of that jury. I further state that no threats or promises have been made to induce me to waive this right, and that I am not under the influence of any drugs, alcohol, or medication that would affect my decision.

{¶ 37} After careful consideration, we are unpersuaded by Morris's argument. Undoubtedly, Morris's written jury waiver does not track the language used in R.C. 2945.05 verbatim. However, viewing the waiver in its entirety, it is clear the language used therein incorporates the strict requirements of R.C. 2945.05. In our view, the additional terms contained in Morris's written jury waiver did not impair the trial court's jurisdiction to try Morris without a jury. At the very least, Morris's written waiver substantially complied with the language of R.C. 2945.05. In addition, our review reflects that the waiver was (1) in writing, (2) signed by the defendant, (3) filed, (4) made part of the record, and (5) made in open court. We further note that Morris specifically confirmed in open court that he signed the written waiver, that he understood the rights he was waiving, and that it was his desire to waive a jury trial. Thus, the record demonstrates that Morris knowingly, intelligently, and voluntarily waived his right to a jury trial in writing. *See* Crim.R. 23(A).

{¶ 38} Under the foregoing circumstances, we are unable to conclude that the trial court erred by proceeding with the bench trial. Morris's first assignment of error is overruled.

## B. Sufficiency and Manifest Weight of the Evidence

{¶ 39} In his second assignment of error, Morris argues his convictions were not supported by sufficient evidence. In his third assignment of error, Morris argues his convictions were against the manifest weight of the evidence. Because Morris raises similar arguments in each, we address these assigned errors together for clarity.

{¶ 40} When assessing a challenge to the sufficiency of the evidence, a reviewing court examines the evidence admitted at trial and determines whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A reviewing court is not to assess "whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997).

{¶ 41} It is well established that the elements of an offense may be proven by direct evidence, circumstantial evidence, or both. *See State v. Durr*, 58 Ohio St.3d 86, 568 N.E.2d 674 (1991). Direct evidence exists when "a witness testifies about a matter within the witness's personal knowledge such that the trier of fact is not required to draw an inference from the evidence to the proposition that it is offered

to establish." *State v. Cassano*, 8th Dist. Cuyahoga No. 97228, 2012-Ohio-4047, ¶ 13. Circumstantial evidence, on the other hand, is evidence that requires "the drawing of inferences that are reasonably permitted by the evidence." *Id.* *See also State v. Hartman*, 8th Dist. Cuyahoga No. 90284, 2008-Ohio-3683, ¶ 37 ("[c]ircumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of mankind.").

{¶ 42} Circumstantial and direct evidence are of equal evidentiary value. *State v. Santiago*, 8th Dist. Cuyahoga No. 95333, 2011-Ohio-1691, ¶ 12. "Although there are obvious differences between direct and circumstantial evidence, those differences are irrelevant to the probative value of the evidence." *Cassano* at ¶ 13, citing *State v. Treesh*, 90 Ohio St.3d 460, 485, 739 N.E.2d 749 (2001). In some cases, circumstantial evidence may be "'more certain, satisfying and persuasive than direct evidence.'" *State v. Lott*, 51 Ohio St.3d 160, 167, 555 N.E.2d 293 (1990), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 5 L.Ed.2d 20 (1960).

{¶ 43} Circumstantial evidence is sufficient to establish the identity of the accused as the person who committed the crime. *In re A.W.*, 8th Dist. Cuyahoga No. 103269, 2016-Ohio-7297, ¶ 28, citing *State v. Lawwill*, 12th Dist. Butler No. CA2007-01-014, 2008-Ohio-3592, ¶ 11. And "[a] conviction can be sustained based on circumstantial evidence alone." *State v. Franklin*, 62 Ohio St.3d 118, 124, 580

N.E.2d 1 (1991), citing *State v. Nicely*, 39 Ohio St.3d 147, 154-155, 529 N.E.2d 1236 (1988).

{¶ 44} A manifest weight challenge questions whether the state met its burden of persuasion. *State v. Freeman*, 8th Dist. Cuyahoga No. 106374, 2018-Ohio-3587, ¶ 18. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d 380, at 388, 678 N.E.2d 541. An appellate court will reverse a conviction as against the manifest weight of the evidence only in the most exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶ 45} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 24. "The jury may take note of any inconsistencies and resolve them accordingly, 'believ[ing] all,

part, or none of a witness's testimony.'" *State v. Burks*, 8th Dist. Cuyahoga No. 106639, 2018-Ohio-4777, ¶ 48, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 46} In this case, Morris was convicted of aggravated robbery in violation of R.C. 2911.01(A)(1), with one- and three-year firearm specifications (Count 1); robbery in violation of R.C. 2911.02(A)(1), with one- and three-year firearm specifications (Count 2); robbery in violation of R.C. 2911.02(A)(2), with one- and three-year firearm specifications (Counts 3-6); robbery in violation of R.C. 2911.02(A)(3), with one- and three-year firearm specifications (Counts 7-10); and kidnapping in violation of R.C. 2905.01(A)(2), with one- and three-year firearm specifications (Counts 11-14).

{¶ 47} R.C. 2911.01(A)(1) defines aggravated robbery as:

(A) No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it.

{¶ 48} Morris's robbery offenses are governed by R.C. 2911.02. The statute provides, in relevant part:

(A) No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall do any of the following:

(1) Have a deadly weapon on or about the offender's person or under the offender's control;

(2) Inflict, attempt to inflict, or threaten to inflict physical harm on another;

(3) Use or threaten the immediate use of force against another.

{¶ 49} Finally, R.C. 2905.01(A)(2), prohibiting kidnapping, provides:

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2) To facilitate the commission of any felony or flight thereafter[.]

{¶ 50} On appeal, Morris does not dispute any specific element of his convictions. Rather, he broadly disputes the state's identification evidence, arguing that the state failed "to prove, beyond a reasonable doubt, that [he] was one of the persons who entered the jewelry store." Morris notes that "four of the five eyewitnesses" were unable to identify the perpetrators inside the store because they were wearing masks. In an effort to avoid the implications of Mr. Kozlowski's identification testimony, Morris argues that Mr. Kozlowski could only identify persons observed outside the store after the robbery occurred. Morris further maintains that the state "relied heavily on the self-serving testimony" of his codefendants, who admitted that they only told the police what they wanted to hear in order to mitigate the charges pursued against them individually.

{¶ 51} In challenging the weight of the evidence supporting his convictions, Morris relies on "the reasons outlined as to why the evidence adduced at trial was

insufficient." He further reiterates that the state's case relied heavily on the "self-serving testimony of Rai'Shoun and Denzel."

{¶ 52} After careful review of the record in its entirety, we find Morris's arguments to be unpersuasive. Here, the evidence presented at trial indicated that in the midst of the incident, Mr. Kozlowski made his way to the back of the building and called 911. While standing near the back door of the building, Mr. Kozlowski observed two men walking towards the back of the property. The men were approximately 20 feet away from Mr. Kozlowski and he was able to clearly observe one of the men's faces. In court, Mr. Kozlowski identified Morris as the man who "he was able to get a good look at." Mr. Kozlowski indicated that he was certain the two men were the same individuals that had just brandished firearms in his store moments earlier.

{¶ 53} In an effort to explain the basis of his identification testimony, Mr. Kozlowski testified that the two men he observed walking were wearing the same clothing as the two masked men. In addition, Mr. Kozlowski expressed that the two men were still wearing their masks, although they were now pulled down and no longer covering their faces. Mr. Kozlowski further noted that Morris has "very distinctive eyes," and identified Morris in court as the individual who pointed a gun at him inside the jewelry store. Mr. Kozlowski explained that even though Morris was wearing a mask inside the store, his eyes were not covered. Significantly, Mr. Kozlowski's description of the men seen walking outside the store just moments

after the robbery, including their skin tone, clothing, and body type, matched the video images of the masked men captured on the surveillance footage of the robbery.

{¶ 54} Mr. Kozlowski's testimony was corroborated by Mavrakis, who testified that he also observed two men walking towards the back of the property moments after the robbery. Mavrakis testified that he assumed the men were the same individuals who had just brandished firearms in the store. Mavrakis testified that although the men did not have their masks on while they were walking, one of the men "pulled the mask back onto his head" once he "saw us out there." Mavrakis even stated that the man struggled to pull his mask over his face because he still had his gun in his hand.

{¶ 55} Viewing this evidence in a light most favorable to the prosecution, we find a reasonable factfinder could find the state presented sufficient evidence of identification. However, we note that the state's case did not rely exclusively on identification testimony. Here, Det. Duffy provided extensive testimony concerning the scope of his investigation, including the recovery of phone records, phone data, and his interviews of Rai'Shoun and Denzel. The relevant phone records demonstrated that shortly before the robbery occurred, Morris and Denzel exchanged text messages regarding their plan to "hit a lick" in Richmond Heights. Denzel further provided testimony indicating that he drove Morris and Rai'Shoun in a gold-colored vehicle to an area located near the jewelry store and dropped them off. Denzel then waited in his car for an unspecified period of time. When Morris and Rai'Shoun finally returned to Denzel's car, they were being followed by another

vehicle that chased them until they reached the interstate. This corresponds with Mr. Kozlowski's testimony that he chased the suspects and their getaway car until he was ordered by the police to stand down.

{¶ 56} The state further introduced cell-phone tower data that mapped the location of Denzel's cell phone on May 22, 2017. Collectively, the data corroborated Denzel's testimony that he was in Richmond Heights during the approximate time of the robbery and subsequently drove westbound towards the location where he stated he dropped Morris and Rai'Shoun off after the robbery occurred.

{¶ 57} Finally, the state introduced testimony from Morris's brother, Rai'Shoun. In relevant part, Rai'Shoun testified that he discovered Morris in his bedroom shortly after the robbery took place. According to Rai'Shoun, Morris was in possession of a firearm, asked him to hold the firearm, was agitated, and indicated that "something had gone wrong." Morris then borrowed Rai'Shoun's cell phone to contact Denzel. Rai'Shoun further admitted that in his written police statement, he had told the police that Morris had told him "about the incident" and "what they had did."

{¶ 58} Viewing this evidence together with the identification testimony, we find the state presented sufficient evidence to support Morris's aggravated robbery, robbery, and kidnapping convictions.

{¶ 59} Moreover, we are unable to conclude that this is the exceptional case in which the evidence weighs heavily against Morris's convictions. Regarding Mr. Kozlowski's testimony, we find his identification of Morris was supported by

reasonable inferences. Here, Mr. Kozlowski consistently stated that Morris was the masked man who pointed a gun at him inside the store during the robbery and the individual he observed walking outside the jewelry store moments after the robbery. Mr. Kozlowski explained that Morris was just feet away from him at the time the gun was pointed at him during the robbery and that he was able to get a good look at Morris's eyes, which he described as being "very distinctive." In addition, Mr. Kozlowski testified that he clearly observed Morris's face as he walked past him without his mask on after the robbery occurred. Mr. Kozlowski stated that he was confident the two men were the same individuals who carried out the robbery, as they were dressed exactly the same, were still wearing masks and gloves, and fled the scene once they noticed Mr. Kozlowski and Mavrakis.

{¶ 60} Similarly, we find no merit to Morris's contention that the state's case relied on the fabricated statements of his codefendants. On appeal, Morris continuously references the fact that Rai'Shoun and Denzel testified that their statements to the police implicating Morris were the product of coercion and were made in an effort to protect themselves. While the record clearly reflects that Rai'Shoun and Denzel's testimony was inconsistent with the statements they originally made to the police, defense counsel had the opportunity to thoroughly cross-examine the witnesses about their motives at the time their original statements were made. On this record, it is evident that Rai'Shoun and Denzel did not wish to participate or cooperate with the prosecution of Morris. The trial court, as the trier of fact, was in the best position to weigh their testimony and was free to

believe all, part, of none of their testimony. Here, while portions of Rai'Shoun and Denzel's testimony contained inconsistent or intentionally vague statements, their testimony collectively provided the trier of fact with information concerning Morris's involvement in the planning of the robbery, his presence at the scene of the robbery, and the actions he took after the robbery occurred. Deferring to the trial court's assessment of credibility, we find Morris's convictions were supported by the manifest weight of the evidence

{¶ 61} Morris's second and third assignments of error are overruled.

{¶ 62} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MARY EILEEN KILBANE, A.J., and
PATRICIA ANN BLACKMON, J., CONCUR