[Cite as *State v. Sykes*, 2025-Ohio-2679.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,           :

                                No. 114512

    v.                                    :

VINCENT SYKES,                          :

    Defendant-Appellant.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 31, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-682679-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kristin M. Karkutt and Mason McCarthy, Assistant Prosecuting Attorneys, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, and Jennifer J. Pritchard, Assistant Public Defender, *for appellant*.

---

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Appellant Vincent Sykes ("Sykes") challenges his conviction and sentence in the Cuyahoga County Court of Common Pleas. He raises two assignments of error:

1. The trial court erred by failing to grant a judgment of acquittal pursuant to Crim.R. 29(A) and thereafter entering judgments of conviction not supported by sufficient evidence, in derogation of appellant's right to due process of law, as protected by the Fifth and Fourteenth Amendments to the United States Constitution, as well as Article I, Section 16 of the Ohio Constitution.

2. The trial court erred by entering judgments of conviction that were against the manifest weight of the evidence, in derogation of Mr. Syke[s]'s right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution as well as Article I, Section 16 of the Ohio Constitution.

{¶ 2} After a thorough review of the applicable law and facts, we affirm the judgment of the trial court.

## I. Factual and Procedural History

{¶ 3} This matter arises from the shooting death of Darnae Barginere ("Barginere") in the early morning hours of May 25, 2023. On the evening in question, Barginere, who was from Detroit, was in town visiting the Cleveland chapter of the motorcycle club of which he was a member, Hell's Lovers. Sykes was in the process of being initiated into this same club.

{¶ 4} Barginere had recently started casually dating a woman named Vianca Mitchell ("Mitchell"), who had previously dated Sykes. That night Barginere, Mitchell, and her friend Charise Frazier ("Frazier") went to the club together. While at the club, they encountered Sykes. Sykes later called Mitchell and sent her text messages asking her if she was going home and saying that he was at her house.

{¶ 5} Around 12:30 a.m., Mitchell, Frazier, and Barginere left the club and were supposed to go to a hotel on the west side of Cleveland. There was an issue

with the hotel reservation, so they went to Mitchell's house instead. Mitchell and Frazier were in a vehicle together, and Barginere was on his motorcycle. Upon arriving at the residence, Mitchell got out of the car and went to the side door to enter the house. Frazier was still inside the vehicle when two men with guns dressed in all black came from the neighbor's yard and shot Barginere 14 times and shot at the vehicle. The gunmen then fled through the backyard to the street where a dark-colored Chevy Equinox was waiting. The Equinox was registered to Darryl McCluney ("McCluney"), who is Sykes's brother-in-law.

{¶ 6} After the shooting stopped, Mitchell went to the car to check on Frazier and then called 911. Police and paramedics responded to the scene, and Barginere was transported to the hospital, where he succumbed to his injuries. In the morning following the shooting, Sykes and a number of other members of the motorcycle club came to the scene of the crime and spoke with police.

{¶ 7} Sykes subsequently went with police to the station for an interview. At this time, he consented to a search of his vehicle and his cellphone. He also provided a DNA sample and was tested for gunshot residue ("GSR"). The GSR test revealed one particle that was indicative of GSR, but this was ultimately determined to be "inconclusive." A black ski mask was recovered from Sykes's vehicle.

{¶ 8} During their investigation, police were able to obtain video from the City of Cleveland's real-time crime center ("RTCC") system cameras that showed the Equinox driving in the vicinity of Mitchell's residence prior to the homicide. The

cameras also showed the Equinox fleeing that area shortly after the shooting and traveling to McCluney's address.

{¶ 9} The police collected evidence at the scene, including 29 separate shell casings. They also collected a burnt cigarette butt from the neighbor's backyard to the left of where Barginere's motorcycle had been. The cigarette butt was found within the vicinity of several shell casings. The cigarette butt was tested for DNA, and it was determined that there was a mixture of DNA present on it. It was determined that Sykes's DNA was present along with one unidentified profile. It could not be determined how long the cigarette butt had been at that location, although it appeared to still have ash on the end of it.

{¶ 10} Sykes and McCluney were jointly indicted on one count of aggravated murder, in violation of R.C. 2903.01(A); two counts of murder, in violation of R.C. 2903.02(A); four counts of felonious assault, in violation of R.C. 2903.11(A)(1) and (2); and two counts of attempted murder, in violation of R.C. 2903.02(A) and 2903.11(A)(2). Sykes was also charged with two counts of having weapons while under disability, in violation of R.C. 2923.13(A)(2) and (A)(3), and McCluney was charged with one count. The first nine counts also had accompanying one- and three-year firearm specifications.

{¶ 11} Sykes and McCluney waived their rights to a jury trial, and the case proceeded to a joint bench trial. The State presented the testimony of 13 witnesses. The first witness was Robert Williams, Mitchell's neighbor who heard the gunshots and called 911. Williams also testified that he observed two men in black flee toward

a "black-looking Chevy Equinox or something" that had been parked in front of his house. (State's exhibit No. 1.) He stated that the two men had "shot some house" that was down the street. (*Id.*)

{¶ 12} During her testimony, Mitchell outlined the events of the night, including her visit to the club, seeing Sykes there while she was with Barginere, receiving text messages and phone calls from Sykes, attempting to go to the hotel with Barginere, and ultimately ending up back at her house. She was unable to identify the shooters but stated that there were two of them, they were wearing all black, and they were about the same height — approximately 5′9″. She testified that Sykes was wearing all black when he was at the club and acknowledged that he had sometimes smoked in her backyard when the two resided together but had never smoked in the neighbor's backyard.

{¶ 13} Frazier testified that after she exited the club and went to the car, Mitchell joined her and talked on the phone with Sykes. Frazier stated that the call was on speakerphone, so she was able to hear the conversation. She said that Sykes was asking Mitchell to get out of the car and get in the car with him. She said Sykes sounded "aggressive, angry." (Tr. 129.) Mitchell also showed her text messages from Sykes from that night where he was asking her when she was coming home and said that he would be at the house.

{¶ 14} With regard to the shooting, Frazier testified that she heard more than 20 gunshots. She stated that she saw only one shooter, who was wearing all black, including a black ski mask. She said that they were aiming at Barginere initially but

later turned and shot at her vehicle. During her testimony, Frazier identified a picture of black Harley boots as the same that the shooter was wearing and said that she recognized them from Sykes; however, she also acknowledged that "everybody" has them. She stated that the shooter was slim with a familiar body frame like that of Sykes.

{¶ 15} Det. Michael Legg, who was assigned to investigate the shooting, first interviewed Sykes the morning after the shooting. The State presented the recording of Sykes's first interview with police on the morning of May 25, 2023. (State's exhibit No. 331.) During the interview, Sykes spoke of Mitchell as being his "girl" and that when he saw her "hugged up" on Barginere at the club on a previous occasion, he thought that was disrespectful. (*Id.*) Sykes said that Mitchell had told him that she had had "chemistry" with Barginere. (*Id.*)

{¶ 16} Sykes said that his "beef" was not with Barginere but was with Mitchell. (*Id.*) He stated that Mitchell confessed to him the prior week that she and Barginere were "messing around with each other or something." (*Id.*) With regard to the night of the shooting, Sykes stated that Mitchell was supposed to come talk to him while he was parked at the club, but then she left. He said that she should not have even been in the club without his consent, but at that point she was "club property"; she was not *his* property yet because he was not fully a member of the club at that point. (*Id.*)

{¶ 17} Sykes further stated that he asked Mitchell if she was "playing games" and that he thought she was "playing [his] feelings and emotions . . . ." (*Id.*) He said

he told her not to have him "sitting [there] looking dumb, meaning sitting at her house when she was not planning to show up there." (*Id.*) When asked where he was sitting at the house, Sykes said that he pulled into the driveway, but after Mitchell told him she was not going to the house, he pulled back out to the end of the driveway. He stated that he left around 12:45 a.m. and went to another woman's house in Shaker Square. He said that woman was not home, but that he spoke to her father and then just slept in his truck until about 4:00 a.m. when he received the call about Barginere's death.

{¶ 18} Sykes denied any involvement in the shooting and urged the detectives to check cameras in Shaker Square so they could see that his truck was there. The detectives interviewed the father of the woman who lived in Shaker Square but were unable to substantiate Sykes's presence at that location.

{¶ 19} Det. Legg further testified that police were able to use RTCC cameras to identify a Chevy Equinox driving to the crime scene and later fleeing the scene. It was determined that the vehicle was registered to McCluney. Police later learned that Sykes was married to McCluney's sister.

{¶ 20} Det. Legg stated that approximately two to three weeks after the shooting, they were notified that the Equinox had been located in Greensboro, North Carolina. Det. Legg and two other detectives traveled to North Carolina and processed the vehicle.

{¶ 21} As part of the investigation, extractions were performed on the cellphones of Sykes, Mitchell, and Barginere. Det. Legg testified regarding the

extraction of the cell phones. States's exhibit Nos. 182 and 183 depicted the following text messages exchanged between Sykes and Mitchell in the weeks leading up to the shooting:[1]

**May 11, 2023**

Sykes: Well, I Love u and my family more than the club

. . . .

**May 19, 2023**

Sykes: Do u love me 4real Damn do u care

Mitchell: Yes I love you always

Sykes: So y the f*** u hurting me wtf for everyone

Mitchell: No

Sykes: No wat

Mitchell: Not for everyone

. . . .

**May 22, 2023**

Sykes: U f***ing with me I really think some Nicca in your ear and u not helping me feel any different abt anything

Sykes: U use to make me feel like I was important to you now I feel like a piece of s*** on your shoe

Sykes: But it's cool

Sykes: Have a awesome day my love [emoji]

. . . .

---

[1] The text messages are presented verbatim.

Sykes: I really hope that u you don't get down there . . . and be trying to see your homebody in Detroit I have to be able to trust you lady please secure me I don't want u running all around like that on Watever he on

Sykes: Please love me right

. . . .

**May 23, 2023**

Sykes: Well u never had to go through this if we didn't have to deal with all our bs

Sykes: I don't want u to have to depend on anyone but me

. . . .

**May 24, 2023**

Sykes: Would have been nice for my BM to speak to me ………to much like right

. . . .

Sykes: So you really don't Want us

Sykes: Because you don't make me feel like it yeah we talk but action is everything so if you not into me and you tell me please I want us so much but if it's not wat we both want I gotta clear my head and prepare the whole in my soul on my own

Mitchell: I told you I would try to work things out and I feel like we needed this time apart I love you but our problems is bigger than that we can't just flick a switch and say everything ok it's a process

Sykes: U would TRY to work things out or we working things out…… and the problem was the club bs to that I'm willing to let go …… but I feel I'm already cut off I barely even talk to you you don't call me and I don't feel important to you

. . . .

{¶ 22} That same night, it appears that Sykes texted Mitchell the link to a song on Apple Music called "Don't Take Your Love Away." Later, the following texts were exchanged after 1:00 a.m. on May 25, 2023:

Sykes: Don't have me here lookin dumb

Sykes: I already feel like that

Sykes: So u not coming home I guess since I'm here

Sykes: Yeah u funny big funny you can't even be [emoji] with me I want bother you any more thanks for the decision u made you don't want this at all you want play

{¶ 23} The State also presented the testimony of the detectives who processed the crime scene and collected evidence, the civilian analyst with the Cleveland Police Department who examined the RTCC camera system to find video of the Equinox on the night of the shooting, and the forensic scientists who performed the GSR test and DNA testing.

{¶ 24} At the close of the State's case, Sykes and McCluney both moved for acquittal under Crim.R. 29(A), which was denied. McCluney then testified on his own behalf. Sykes did not testify or present any evidence.

{¶ 25} The trial court found Sykes guilty of all counts and specifications. McCluney was acquitted of all counts and specifications. Sykes was sentenced to an aggregate sentence of life in prison with the possibility of parole after 26 years. Sykes then filed the instant appeal.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 26} In his first assignment of error, Sykes argues that his convictions were not supported by sufficient evidence. In particular, Sykes contends that the State failed to produce sufficient evidence as to the identification of Sykes as the individual who murdered Barginere and attempted to murder Mitchell and Frazier because the eyewitnesses to the shooting were unable to identify the person who committed the crimes. They provided only a general description of what the individuals were wearing, and the shooting occurred in an unlit area. Further, the vehicle that was identified through RTCC camera footage was determined only to be a "similar vehicle" to the Chevy Equinox owned by McCluney; regardless, there was no evidence presented that Sykes operated or even had been in McCluney's Equinox. Moreover, there was no evidence presented that Sykes communicated with McCluney in any way. Finally, Sykes contends that it was unknown how long the cigarette butt had been on the ground in the neighbor's yard, and it may have been deposited at a time preceding the shooting since Frazier had testified that Sykes was still living at Mitchell's residence two days prior to the shooting.

{¶ 27} "Crim.R. 29(A)(1) provides that a court 'shall order the entry of the judgment of acquittal of one or more offenses . . . if the evidence is insufficient to sustain a conviction of such offense or offenses.'" *State v. McQuisition*, 2024-Ohio-3011, ¶ 24 (8th Dist.). "A Crim.R. 29 motion questions the sufficiency of the evidence, and we apply the same standard of review to a trial court's ruling on a

Crim.R. 29 motion as we do in reviewing challenges to the sufficiency of the evidence presented at trial." *Id.*, citing *Fairview Park v. Peah*, 2021-Ohio-2685, ¶ 37 (8th Dist.).

{¶ 28} "'[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt.'" *Id.* at ¶ 25, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991). "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *id.* at paragraph two of the syllabus, citing *Jackson v. Virginia*, 443 U.S. 307 (1979). "'In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 29} It is true that this case relies heavily on circumstantial evidence. This court has noted that circumstantial evidence "is evidence that requires 'the drawing of inferences that are reasonably permitted by the evidence.'" *State v. Evans*, 2020-Ohio-3968, ¶ 37 (8th Dist.), quoting *State v. Cassano*, 2012-Ohio-4047, ¶ 13 (8th Dist.). "Circumstantial and direct evidence are of equal evidentiary value." *Id.* at ¶ 38, citing *State v. Santiago*, 2011-Ohio-1691, ¶ 12 (8th Dist.). "Circumstantial evidence is the proof of facts by direct evidence from which the trier of fact may infer or derive by reasoning other facts in accordance with the common experience of

mankind." *State v. Hartman*, 2008-Ohio-3683, ¶ 37 (8th Dist.), citing *State v. Griesheimer*, 2007-Ohio-837 (10th Dist.).

{¶ 30} Additionally, "circumstantial evidence and direct evidence inherently possess the same probative value." *Hartman* at ¶ 37, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. "The Ohio Supreme Court has 'long held that circumstantial evidence is sufficient to sustain a conviction if that evidence would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *Cassano* at ¶ 13, quoting *State v. Heinish*, 50 Ohio St.3d 231, 238 (1990).

{¶ 31} In the instant matter, the text messages sent from Sykes place him at Mitchell's house on the night of the shooting. Sykes's DNA was also determined to be present on the cigarette butt found near shell casings at Mitchell's house. Sykes's alibi of where he claimed to be later that night was not substantiated by police. Moreover, the text messages demonstrate that Sykes wanted to work things out with Mitchell and that he was unhappy that she was making him "look dumb" and not meeting him at her house. Sykes stated in his first interview with police that he felt disrespected upon seeing Mitchell "hugged up" on Barginere. Finally, the Equinox that was seen traveling to Mitchell's house and later fleeing the scene belonged to McCluney, who was Sykes's wife's brother. There was no evidence that anyone other than Sykes had any issue with Barginere that night.

{¶ 32} Viewing the evidence in a light most favorable to the State, we find that Sykes's convictions were based upon sufficient evidence. Sykes's first assignment of error is overruled.

## B. Manifest Weight of the Evidence

{¶ 33} In his second assignment of error, Sykes argues that his convictions were against the manifest weight of the evidence for all of the reasons listed in his sufficiency argument and the fact that all of the evidence in this case was circumstantial.

{¶ 34} In determining whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387, (1997). In our manifest-weight review of a bench trial verdict, we recognize that the trial court serves as the factfinder and not a jury. *State v. Crenshaw*, 2020-Ohio-4922, ¶ 23 (8th Dist.). To warrant reversal from a bench trial under a manifest-weight-of-the-evidence claim, this court must determine that "the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Crenshaw* at *id*. "A conviction should be reversed as against the manifest weight of the evidence only in the most 'exceptional case in which evidence weighs heavily against conviction.'" *Id.*, quoting *Thompkins* at 387.

{¶ 35} As acknowledged both by Sykes and the State, this case turns on the issue of identification. Sykes argues that there was only circumstantial evidence of his identification and that the State failed to meet its burden of proof. "'Proof of guilt

may be made by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value.'" *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.), quoting *State v. Zadar*, 2011-Ohio-1060, ¶ 18 (8th Dist.). Further, circumstantial evidence ""may also be more certain, satisfying, and persuasive than direct evidence."" *Id.* at ¶ 36, quoting *State v. Hawthorne*, 2011-Ohio-6078, ¶ 9 (8th Dist.), quoting *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

{¶ 36} Sykes is correct that no individual piece of evidence is conclusive; however, when viewed as a whole, all of the circumstantial evidence allowed the court to reasonably infer that Sykes was the shooter, to wit: (1) Sykes's DNA on the cigarette butt, which was found near the crime scene where shell casings were found; (2) statements made by Sykes during his interview where he stated that Mitchell was going to be his "property" and that he felt disrespected by her interaction with Barginere at the club; (3) Sykes's text message to Mitchell where he stated that he was at her house; (4) Frazier's testimony that the body frame of the shooter looked like Sykes and her identification of his Harley boots; and (5) the shooters were described as wearing black ski masks, and a black ski mask was found in Sykes's vehicle when it was processed by police. It appears from the evidence that Sykes had the motive to kill Barginere, had knowledge of where Mitchell and Barginere could end up that night, and was familiar with the crime-scene area.

{¶ 37} Sykes takes issue with the GSR testing, the DNA found on the cigarette butt, and the text messages. He contends that the text messages demonstrated that

Sykes was done with his relationship with Mitchell and not jealous of her involvement with Barginere. He maintains that the gun shot residue testing was inconclusive and thus could not be used as evidence to convict him. With regard to the cigarette butt, Sykes contends that this evidence was not probative because there was a mixture of DNA on the cigarette butt, and there are many possibilities as to how the cigarette butt was found near the crime scene, particularly since Sykes used to reside at Mitchell's house. Finally, Sykes asserts that the ski mask that was collected from his vehicle had gold embroidery on it and the boots that he was wearing during his interview were gray. Consequently, he maintains that these items did not match the black ski masks or black boots said to be worn by the shooters.

{¶ 38} With regard to the text messages, the court also heard from Frazier who discussed the phone call she overheard between Sykes and Mitchell and characterized Sykes as sounding "aggressive, angry." As it relates to the ski mask and boots, it is undisputed that it was dark at the crime scene, and it is easy to imagine that gray boots may have looked black and embroidery may not have been visible on the ski mask. In addition, the trial court heard testimony from the forensic witnesses addressing reliability issues with the GSR and cigarette butt. The fact-finder "is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Ellis*, 2013-Ohio-1184, ¶ 18 (8th Dist.).

{¶ 39} Sykes further points out inconsistencies between the testimony of Mitchell and Frazier. This court has held that "minor inconsistencies in witness

testimony will not render a conviction so against the manifest weight of the evidence as to cause a miscarriage of justice." *State v. Weems*, 2016-Ohio-701, ¶ 29-30 (8th Dist.). While there were some minor inconsistencies between Mitchell and Frazier's testimony, such as the fact that Frazier saw one shooter and Mitchell observed two, their testimony was consistent in many material respects, particularly with regard to the text messages and phone call between Sykes and Mitchell earlier that night.

{¶ 40} As with all circumstantial evidence, nothing in the State's case directly proved that Sykes was one of the shooters. But the State's evidence, when viewed as a whole, made a compelling case for Sykes's guilt. We do not find that this is the exceptional case where the trier of fact lost its way. Sykes's conviction was not against the manifest weight of the evidence, and his second assignment of error is overruled.

{¶ 41} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

MARY J. BOYLE, J., and
ANITA LASTER MAYS, J., CONCUR